(Slip Opinion) OCTOBER TERM, 2022 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BITTNER *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 21–1195.   Argued November 2, 2022—Decided February 28, 2023

The Bank Secrecy Act (BSA) and its implementing regulations require U. S. persons with certain financial interests in foreign accounts to file an annual report known as an "FBAR"—the Report of Foreign Bank and Financial Accounts. The statute imposes a maximum $10,000 penalty for nonwillful violations of the law. These reports are designed to help the government trace funds that may be used for illicit purposes and identify unreported income that may be subject to taxation. Petitioner Alexandru Bittner—a dual citizen of Romania and the United States—learned of his BSA reporting obligations after he returned to the United States from Romania in 2011, and he subsequently submitted the required annual reports covering five years (2007 through 2011). The government deemed Bittner's late-filed reports deficient because the reports did not address all accounts as to which Bittner had either signatory authority or a qualifying interest. Bittner filed corrected FBARs providing information for each of his accounts—61 accounts in 2007, 51 in 2008, 53 in 2009 and 2010, and 54 in 2011. The government neither contested the accuracy of Bittner's new filings nor suggested that Bittner's previous errors were willful. But because the government took the view that nonwillful penalties apply to each account not accurately or timely reported, and because Bittner's five late-filed annual reports collectively involved 272 accounts, the government calculated the penalty due at $2.72 million. Bittner challenged that penalty in court, arguing that the BSA authorizes a maximum penalty for nonwillful violations of $10,000 per report, not $10,000 per account. The Fifth Circuit upheld the government's assessment.

*Held*: The BSA's $10,000 maximum penalty for the nonwillful failure to file a compliant report accrues on a per-report, not a per-account, basis. Pp. 4–14, 16.

(a) The Court begins with the terms of the most immediately rele-vant statutory provisions—31 U. S. C. §5314, which delineates an in-dividual's legal duties under the BSA, and §5321, which outlines the penalties that follow for failing to discharge those duties. Section 5314 provides that the Secretary of the Treasury "shall" require certain per-sons to "keep records, file reports, or keep records and file reports" when they "mak[e] a transaction or maintai[n] a relation" with a "for-eign financial agency." The statute states that reports "shall contain" information about "the identity and address of participants in a trans-action or relationship," "the legal capacity in which a participant is acting," and "the identity of real parties in interest," along with a "de-scription of the transaction." Section 5314 does not speak of accounts or their number but rather the legal duty to file reports which must include various kinds of information about an individual's foreign "transaction[s] or relationship[s]." Violation of §5314's reporting obli-gation is binary: One files a report "in the way and to the extent the Secretary prescribes," or one does not; multiple willful errors may es-tablish a violation of §5314 but even a single mistake, willful or not, constitutes a §5314 violation. The only distinction the law draws be-tween a report containing a single mistake and one containing multi-ple mistakes concerns the appropriate penalty.

Section 5321 authorizes the Secretary to impose a civil penalty of up to $10,000 for "any violation" of §5314. The "nonwillful" penalty pro-vision in §§5321(a)(5)(A) and (B)(i) does not speak in terms of accounts but rather pegs the quantity of nonwillful penalties to the quantity of "violation[s]." Section 5314 provides that a violation occurs when an individual fails to file a report consistent with the statute's commands. Multiple deficient reports may yield multiple $10,000 penalties, and even a seemingly simple deficiency in a single report may expose an individual to a $10,000 penalty. But penalties for nonwillful violations accrue on a per-report, not a per-account, basis.

To be sure, for certain cases that involve willful violations, the stat-ute *does* tailor penalties to accounts. Section 5321 specifically ad-dresses a subclass of willful violations that involve "a failure to report the existence of an account or any identifying information required to be provided with respect to an account." §5321(a)(5)(D)(ii). In such cases, the Secretary may impose a maximum penalty of either $100,000 or 50% of "the balance in the account at the time of the vio-lation"—whichever is greater. §5321(a)(5)(C) and (D)(ii). The govern-ment maintains that because Congress explicitly authorized per-ac-count penalties for some willful violations, the Court should infer that Congress meant to do so for analogous nonwillful violations. But the government's interpretation defies a traditional rule of statutory con-struction: When Congress includes particular language in one section

of a statute and omits it from a neighbor, the Court normally understands that difference in language to convey a difference in meaning (*expressio unius est exclusio alterius*). Here the statute twice provides evidence that when Congress wished to tie sanctions to account-level information, it knew exactly how to do so. Congress said in §§5321(a)(5)(C) and (D)(ii) that penalties for certain willful violations may be measured on a per-account basis. And Congress said in §5321(a)(5)(B)(ii) that a person may invoke the reasonable cause exception only on a showing of per-account accuracy. But Congress did not say that the government may impose nonwillful penalties on a per-account basis. Pp. 5–8.

   (b) The Court finds a number of additional contextual clues that cut against the government's theory in this case. First, the government has repeatedly issued guidance to the public—in various warnings, fact sheets, and instructions—that seems to tell the public that the failure to file a report represents a single violation exposing a nonwillful violator to one $10,000 penalty. While the government's guidance documents do not control the Court's analysis, courts may consider the inconsistency between the government's current view and its past views when weighing the persuasiveness of any interpretation it offers. *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140.

   Second, the drafting history of the nonwillful penalty provision undermines the theory the government urges the Court to adopt. In 1970, the BSA included penalties only for willful violations. In 1986, Congress authorized the imposition of penalties on a per-account basis for certain willful violations. When Congress amended the law again in 2004 to authorize penalties for nonwillful violations, Congress could have, but did not, simply use language from its 1986 amendment to extend per-account penalties for nonwillful violations.

   Still other features of the BSA and its regulatory scheme suggest the law aims to provide the government with a report sufficient to tip it to the need for further investigation, *not* to ensure the presentation of every detail or maximize revenue for each mistake. Consider that Congress declared that the BSA's "purpose" is "to require" certain "reports" or "records" that may assist the government in various kinds of investigations. §5311. Absent is any indication that Congress sought to maximize penalties for every nonwillful mistake. Similarly, the Secretary's regulations implementing the BSA require individuals with fewer than 25 accounts to provide details about each account while individuals (like Bittner) with 25 or more accounts do not need to list each account or provide account-specific details unless the Secretary requests more "detailed information." 31 CFR §1010.350(g)(1). Finally, the government's per-account penalty reading invites anomalies—for example, subjecting willful violators to lower penalties than

Syllabus

nonwillful violators—avoided by reading the nonwillful penalty to apply on a per-report basis.

The government replies that the per-report interpretation risks the anomaly that the Secretary could formulate reporting requirements to require a separate report for each account and in that way effectively achieve a per-account penalty for nonwillful violations. What this proves is unclear, as the Secretary's discretion to require more (or fewer) reports is not at issue here, and in any event does not answer whether the Secretary may impose nonwillful penalties on a per-report or per-account basis. Pp. 9–14.

(c) Best read, the BSA treats the failure to file a legally compliant report as one violation carrying a maximum penalty of $10,000. P. 16.

19 F. 4th 734, reversed and remanded.

GORSUCH, J., announced the judgment of the Court, and delivered the opinion of the Court except as to Part II–C. JACKSON, J., joined that opinion in full, and ROBERTS, C. J., and ALITO and KAVANAUGH, JJ., joined except for Part II–C. BARRETT, J., filed a dissenting opinion, in which THOMAS, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES
_____

No. 21–1195
_____

## ALEXANDRU BITTNER, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[February 28, 2023]

JUSTICE GORSUCH announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, II–B, and III, and an opinion with respect to Part II–C, in which JUSTICE JACKSON joins.

The Bank Secrecy Act and its implementing regulations require certain individuals to file annual reports with the federal government about their foreign bank accounts. The statute imposes a maximum $10,000 penalty for nonwillful violations of the law. But recently a question has arisen. Does someone who fails to file a timely or accurate annual report commit a single violation subject to a single $10,000 penalty? Or does that person commit separate violations and incur separate $10,000 penalties for each account not properly recorded within a single report?

The answer makes a difference, especially for immigrants who hold accounts abroad and Americans who make their lives outside the country. On one view, penalties accrue on a per-report basis. So, for example, a single late-filed report disclosing the existence of 10 accounts may yield a maximum fine of $10,000. On another view, penalties multiply on a per-account basis, so the same report can invite a fine

of $100,000 even if the individual's foreign holdings or total net worth do not approach that amount.  Because the Ninth Circuit read the law one way and the Fifth Circuit the other, we agreed to take this case.

I

The Bank Secrecy Act (BSA) does not make it illegal to hold foreign accounts.  Nor does the BSA tax those accounts.  To the contrary, the federal government has acknowledged that "U. S. persons maintain overseas financial accounts for a variety of legitimate reasons including convenience and access."  IRS Pub. 5569, Report of Foreign Bank & Financial Accounts (FBAR) Reference Guide, p. 1 (Rev. 3–2022).  As relevant here, the BSA simply requires those who possess foreign accounts with an aggregate balance of more than $10,000 to file an annual report on a form known as an "FBAR"—the Report of Foreign Bank and Financial Accounts.  31 U. S. C. §5314; 31 CFR §1010.306 (2021).  These reports are designed to help the government "trace funds" that may be used for "illicit purposes" and identify "unreported income" that may be subject to taxation separately under the terms of the Internal Revenue Code.  FBAR Reference Guide, at 1.

The facts of the Ninth and Fifth Circuit cases help illuminate the particular question about the BSA now before us.  The first dispute involved Jane Boyd, an American citizen who held 13 relevant accounts in the United Kingdom.  The amounts in those accounts increased significantly after her father died in 2009 and she deposited her inheritance.  *United States* v. *Boyd*, 991 F. 3d 1077, 1079 (CA9 2021).  Because the aggregate amount in Ms. Boyd's accounts exceeded $10,000 in 2009, she should have filed an FBAR in 2010.  Neglecting to do so, she corrected the error in 2012, submitting a complete and accurate report at that time.  *Ibid.*  The government acknowledged that Ms. Boyd's violation of the law was "non-willful."  Still, the government said,

it had the right to impose a $130,000 penalty—$10,000 for each of her 13 late-reported accounts. *Ibid.*

Ms. Boyd challenged the penalty in court where she argued that her failure to file a single timely FBAR subjected her to a single maximum penalty of $10,000. The district court rejected that argument and sided with the government. *United States* v. *Boyd*, 123 AFTR 2d 2019–1651 (CD Cal. 2019). But in time the Ninth Circuit vindicated Ms. Boyd's view, holding that the BSA authorizes "only one non-willful penalty when an untimely, but accurate, FBAR is filed, no matter the number of accounts." 991 F. 3d, at 1078.

More recently, the same question arose in the Fifth Circuit in a case involving Alexandru Bittner. Born and raised in Romania, Mr. Bittner immigrated to the United States at a young age in 1982. He worked first as a dishwasher and later as a plumber and along the way became a naturalized citizen. After the fall of communism, Mr. Bittner returned to Romania in 1990 where he launched a successful business career. Like many dual citizens, he did not appreciate that U. S. law required him to keep the government apprised of his overseas financial accounts even while he lived abroad. 19 F. 4th 734, 739–740 (CA5 2021). Shortly after returning to the United States in 2011, Mr. Bittner learned of his reporting obligations and engaged an accountant to help him prepare the required reports—covering five years, from 2007 through 2011. *Id.*, at 739.

But the story did not end there. The government identified a problem in the late-filed reports. While those reports provided details about Mr. Bittner's largest account, they neglected to address 25 or more other accounts over which he had signatory authority or in which he had a qualifying interest. *Ibid.* After the government informed him of this deficiency, Mr. Bittner hired a new accountant who helped him file corrected FBARs for each year in question. *Ibid.*

Under governing regulations, filers with signatory authority over or a qualifying interest in fewer than 25 accounts must provide details about each account, but individuals with 25 or more accounts need only check a box and disclose the total number of accounts. 31 CFR §1010.350(g). Instead of employing that expediency, however, Mr. Bittner and his new accountant volunteered details for each and every one of his accounts—61 accounts in 2007, 51 in 2008, 53 in 2009 and 2010, and 54 in 2011. 19 F. 4th, at 738.

The question then turned to what penalty Mr. Bittner should pay. The government did not contest the accuracy of Mr. Bittner's new filings. Nor did the government suggest that his previous errors were willful. But because the government took the view that nonwillful penalties apply to each account not accurately or timely reported, and because Mr. Bittner's late-filed reports for 2007–2011 collectively involved 272 accounts, the government thought a fine of $2.72 million was in order. *Id.,* at 739–740.

Like Ms. Boyd before him, Mr. Bittner challenged his penalty in court, arguing that the BSA authorizes a maximum penalty for nonwillful violations of $10,000 per report, not $10,000 per account. As he put it, an individual's failure to file five reports in a timely manner might invite a penalty of $50,000, but it cannot support a penalty running into the millions. The district court agreed with Mr. Bittner's reading of the law, *United States* v. *Bittner*, 469 F. Supp. 3d 709, 724–726 (ED Tex. 2020), but the Fifth Circuit upheld the government's assessment, 19 F. 4th, at 749.

## II

With those facts in mind, the question before us boils down to this: Does the BSA's $10,000 penalty for nonwillful violations accrue on a per-report or a per-account basis? Mr. Bittner urges us to agree with the Ninth Circuit and hold that the law authorizes a single $10,000 fine for each untimely or inaccurate report. The government defends the

judgment of the Fifth Circuit and asks us to hold that a new $10,000 penalty attaches to each account not timely or accurately disclosed within a report.

A

To resolve who has the better reading of the law, we begin with the terms of the most immediately relevant statutory provisions, 31 U. S. C. §5314 and §5321. The first delineates an individual's legal duties under the BSA, the second outlines the penalties that follow for failing to discharge those duties.

Section 5314 provides that the Secretary of the Treasury "shall" require certain persons to "keep records, file reports, or keep records and file reports" when they "mak[e] a transaction or maintai[n] a relation" with a "foreign financial agency." §5314(a). When it comes to the duty to file reports, the relevant duty in our case, the statute says that reports "shall contain" information about "the identity and address of participants in a transaction or relationship," "the legal capacity in which a participant is acting," and "the identity of real parties in interest," along with a "description of the transaction." §§5314(a)(1)–(4). The law also directs the Secretary to prescribe "the way and . . . the extent" to which reports must be filed. §5314(a).

Immediately, one thing becomes clear. Section 5314 does not speak of accounts or their number. The word "account" does not even appear. Instead, the relevant legal duty is the duty to file reports. Of course, those reports must include various kinds of information about an individual's foreign "transaction[s] or relationship[s]." But whether a report is filed late, whether a timely report contains one mistake about the "address of [the] participants in a transaction," or whether a report includes multiple willful errors in its "description of . . . transaction[s]," the duty to supply a compliant report is violated. Put another way, the statutory obligation is binary. Either one files a report "in the

way and to the extent the Secretary prescribes," or one does not. Multiple willful errors about specific accounts in a single report may confirm a violation of §5314, but even a single nonwillful mistake is enough to pose a problem. One way or another, §5314 is violated. The only distinction the law draws between these cases concerns the appropriate penalty.

That's where §5321 comes in. As a baseline, §5321(a)(5) authorizes the Secretary to impose a civil penalty of up to $10,000 for "any violation" of §5314. 31 U. S. C. §§5321(a)(5)(A) and (B)(i). Some call this the "nonwillful" penalty provision. And here again, one thing is immediately apparent: The law still does not speak of accounts or their number. Instead, the statute pegs the quantity of nonwillful penalties to the quantity of "violation[s]." And as we have seen, §5314 provides that a violation occurs when an individual fails to file a report consistent with the statute's commands. So multiple deficient reports may yield multiple $10,000 penalties, and even a seemingly simple deficiency in a single report may expose an individual to a $10,000 penalty. But in all cases, penalties for nonwillful violations accrue on a per-report, not a per-account, basis.[1]

To be sure, the statute's penalty provisions do not stop there. Section 5321 goes on to say that if an individual "willfully" violates §5314, he may face a maximum penalty of $100,000. §5321(a)(5)(C)(i)(I). The statute then adds an even more specific rule for a subclass of willful violations—those that involve "a failure to report the existence of an account or any identifying information required to be provided with respect to an account." §5321(a)(5)(D)(ii). In cases like that, the law authorizes the Secretary to impose

---

[1] What, if any, *mens rea* the government must prove to impose a "nonwillful" penalty is not before us.

a maximum penalty of either $100,000 or 50% of "the balance in the account at the time of the violation"—whichever is greater. §§5321(a)(5)(C) and (D)(ii). So here, at last, the law *does* tailor penalties to accounts. But the statute does so only for a certain category of cases that involve willful violations, not for cases like ours that involve only nonwillful violations.

No surprise, the government seeks to turn this feature of the law to its advantage. Because Congress explicitly authorized per-account penalties for some willful violations, the government asks us to infer that Congress meant to do so for analogous nonwillful violations as well. Brief for United States 20–23. But, in truth, this line of reasoning cuts against the government. When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning (*expressio unius est exclusio alterius*). The government's interpretation defies this traditional rule of statutory construction. See, *e.g.*, *Department of Homeland Security* v. *MacLean*, 574 U. S. 383, 391 (2015); *Gallardo* v. *Marstiller*, 596 U. S. \_\_\_, \_\_\_, \_\_\_ (2022) (slip op., at 7, 9).

The government's problem repeats itself too. Section 5321(a)(5)(B)(ii) contains a "[r]easonable cause exception." That exception allows an individual to escape a penalty (say for filing late) only if his violation was nonwillful, "due to reasonable cause," and the report he eventually files accurately reflects each and every account.[2] All of which supplies further evidence that, when Congress wished to tie sanctions to account-level information, it knew exactly how to do so. Congress said that penalties for certain willful violations may be measured on a per-account basis. Congress

_____

[2] At argument, the government explained that the reasonable cause exception works in this fashion to protect those who file a late FBAR so long as the report they eventually file accurately provides the required information. Tr. of Oral Arg. 57–58.

said that a person may invoke the reasonable cause excep-
tion only on a showing of per-account accuracy. But the one
thing Congress did not say is that the government may im-
pose nonwillful penalties on a per-account basis. Conspic-
uously, the one place in the statute where the government
needs per-account language to appear is the one place it
does not. In the end, the government's per-account theory
faces not just a single *expressio unius* challenge but two.[3]

The dissent founders on the same shoals. It suggests that
the "pattern" of account-specific language in the willful pen-
alty provision and the reasonable cause exception "con-
not[es]" that the nonwillful penalty provision must operate
on a per-account basis. *Post*, at 4, 7 (opinion of BARRETT,
J.). But (again), just because two provisions in the law are
similar does not mean we may ignore differences found in a
third. Seeking a way around the problem, the dissent
points to the fact that even a single qualifying foreign bank
account "triggers" the duty to file a report, and the fact that
a compliant report must contain a "list of information"
about bank addresses and the like. *Post*, at 2–3. These fea-
tures of the law, the dissent says, "underscor[e]" that non-
willful violations accrue per account. *Post,* at 2. But that
simply does not follow. The fact that a person has a duty to
file a report, or provide certain information in a report, does
not tell us whether penalties for nonwillful violations ac-
crue per report or multiply per account without regard to
an individual's net worth or foreign holdings.[4]

————————

[3] What if an individual (like Mr. Bittner) fails to file a timely report
and later files an inaccurate one—would the statute classify that as two
violations of the duty to file a statutorily compliant report rather than
one? The parties do not join issue on the question and we do not pass
upon it. Nor does the answer matter for present purposes. Either way,
the statute conditions nonwillful penalties on the number of reports, not
on the number of accounts.

[4] The dissent also stresses that 31 U. S. C. §5314 imposes two duties—
a duty to file reports *and* keep records. *Post,* at 3. From this, the dissent

## B

Widening our view beyond §5314 and §5321, we find other contextual clues pressing against the government's theory. Consider what the government itself has told the public about the BSA. In 2010, the Department of the Treasury issued a notice of proposed rulemaking warning that, under its proposed rules, "[a] person who is required to file an FBAR and fails to properly file may be subject to a civil penalty not to exceed $10,000." 75 Fed. Reg. 8854 (2010). Elsewhere, the government has told suspected FBAR violators that "[f]or the failure to file . . . the penalty cannot exceed $10,000." IRS, Letter 3709, p. 1 (Mar. 2011). Instructions included with the FBAR form have cautioned that "[a] person who is required to file an FBAR and fails to properly file may be subject to a civil penalty not to exceed $10,000." IRS, Form TD F 90–22.1, p. 8 (Mar. 2011). An IRS "Fact Sheet" has advised that, "[f]or the FBAR, the penalty may be up to $10,000, if the failure to file is non-willful." IRS, Offshore Income and Filing Information for Taxpayers with Offshore Accounts, FS–2014–7 (June 2014). Ms. Boyd herself received a similarly worded letter alerting her that "'[f]or the failure to file [the FBAR] . . . the penalty cannot exceed $10,000.'" *Boyd*, 991 F. 3d, at 1085, n. 11 (alterations in original and emphasis deleted).

None of these representations about the law's operation fits easily with the government's current theory. In all of these warnings, fact sheets, and instructions, the govern-

---

reasons, "if violations of [the] recordkeeping obligation accrue on a per-account basis, the same should be true of violations of [the] obligation to file reports." *Ibid*. But the question whether violations of the recordkeeping duty accrue per account or on some other basis is not before us. Nor is it obvious why violations of two separate statutory duties must accrue in the same way—especially when the law authorizes the Secretary to "prescrib[e]" different "way[s]" the two duties may be discharged. §5314(a).

ment seemed to tell the public that the failure to file a re-
port represents a single violation exposing a nonwillful vio-
lator to one $10,000 penalty.  Nowhere in these materials
did the government announce its current theory that a sin-
gle deficient or untimely report can give rise to multiple vi-
olations, that the number of nonwillful penalties may turn
on the number of accounts, or that the $10,000 maximum
penalty may be multiplied 272 times or more without re-
spect to an individual's foreign holdings or net worth.

Doubtless, the government's guidance documents do not
control our analysis and cannot displace our independent
obligation to interpret the law.  But this Court has long said
that courts may consider the consistency of an agency's
views when we weigh the persuasiveness of any interpreta-
tion it proffers in court.  *Skidmore* v. *Swift & Co.*, 323 U. S.
134, 140 (1944).  Here, the government has repeatedly is-
sued guidance to the public at odds with the interpretation
it now asks us to adopt.  And surely that counts as one more
reason yet to question whether its current position repre-
sents the best view of the law.[5]

The drafting history of the nonwillful penalty provision
undermines the government's theory too.  When Congress
adopted the BSA in 1970, the law included penalties only
for willful violations and capped them at $1,000.  Pub. L.
91–508, §125(a), 84 Stat. 1117.  It took many years before

--------

[5] The dissent expresses "surpris[e]" that we cite the government's guid-
ance documents.  *Post*, at 8.  We don't see why.  Our point is not that the
administrative guidance is controlling.  Nor is it that the government's
guidance documents have consistently endorsed Mr. Bittner's reading of
the law.  It is simply that, when the government (or any litigant) speaks
out of both sides of its mouth, no one should be surprised if its latest
utterance isn't the most convincing one.  This is no new principle in the
law any more than it is in life.  In *Skidmore*, this Court noted that the
persuasiveness of an agency's interpretation of the law may be under-
mined by its inconsistency "with earlier [agency] pronouncements."  323
U. S., at 140.

Congress in 1986 authorized the government to impose penalties on a per-account basis for certain willful violations. Pub. L. 99–570, §1357(c), 100 Stat. 3207-25. And it took many years more before Congress in 2004 amended the law again to authorize penalties for nonwillful violations. Pub. L. 108–357, §821(a), 118 Stat. 1586. When crafting this latest provision, it would have been the simplest thing for Congress to model its work on its 1986 amendment and authorize per-account penalties for nonwillful violations just as it had for certain willful ones. But Congress didn't do anything like that. The language it adopted for nonwillful penalties in 2004 bears scant resemblance to the language it used when authorizing per-account penalties for certain willful violations in 1986.

Consider as well Congress's statement of purpose. Congress has declared that the BSA's "purpose" is "to require" certain "reports" or "records" that may assist the government in everything from criminal and tax to intelligence and counterintelligence investigations. 31 U. S. C. §5311.[6] Here we see further evidence that the relevant legal duty the BSA establishes is the duty to file certain reports. We see evidence, too, that the point of these reports is to supply the government with information potentially relevant to various kinds of investigations, criminal and civil alike. But what we do not see is any indication that Congress sought to maximize penalties for every nonwillful mistake (whether a late filing, a transposed account number, or an out-of-date bank address). See Brief for American College

—————

[6] "A preamble, purpose clause, or recital is a permissible indicator of meaning." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 217 (2012). See also 1 J. Story, Commentaries on the Constitution of the United States §459, p. 443 (1833) ("[T]he preamble of a statute is a key to open the mind of the makers, as to the mischiefs, which are to be remedied, and the objects, which are to be accomplished by the provisions of the statute").

of Trust and Estate Counsel as *Amicus Curiae* 5–7.[7]

The Secretary's regulations implementing the BSA convey the same message. Under those regulations, individuals with fewer than 25 accounts must provide details about each account while those (like Mr. Bittner) with 25 or more accounts do not need to list each one or provide account-specific details about any of them. 31 CFR §1010.350(g)(1). Instead, filers with 25 or more accounts "need only provide the number of financial accounts and certain other basic information." *Ibid.* Naturally, an individual must supply more "detailed information" if the "Secretary or his delegate" later chooses to follow up and request it. *Ibid.* But no detailed account-level information is required in the filer's initial report. It's yet another feature of the BSA and its regulatory scheme that suggests the law aims to provide the government with a report sufficient to tip it to the need for further investigation, *not* to ensure the presentation of every detail or maximize revenue for each mistake.

The Secretary's regulation also points to some of the anomalies that accompany the government's per-account theory. On the government's telling, an individual with, say, three accounts who makes nonwillful errors when providing details about these accounts faces a potential penalty of $30,000. He faces that penalty no matter how slight his errors, and regardless whether his foreign holdings (or even net worth) approach the same amount. Meanwhile, a person with 300 bank accounts runs far less risk of

---

[7] The dissent insists that its per-account theory would better advance "the statute's purpose" of cracking down on criminals and terrorists. *Post*, at 9. But few statutes pursue their stated "'purpose at all costs.'" *Kucana* v. *Holder*, 558 U. S. 233, 252 (2010). Nor is it clear how calculating *nonwillful* penalties on a per-account basis would advance the purpose the dissent attributes to the BSA. Are we to imagine that drug cartels and terrorists often make innocent mistakes when filing their FBARs?

incurring any penalty. He doesn't have to provide any detail about his accounts, just correctly disclose how many he holds. See also Brief for American College of Tax Counsel as *Amicus Curiae* 15–16 (Brief for Tax Counsel).

Nor is this the only incongruity the government's theory invites. Consider someone who has a $10 million balance in a single account who nonwillfully fails to report that account. Everyone agrees he is subject to a single penalty of $10,000. Yet under the government's theory, another person engaging in the same nonwillful conduct with respect to a dozen foreign accounts with an aggregate balance of $10,001 would be subject to a penalty of $120,000. *Id.*, at 14–15.

On the government's view, too, those who *willfully* violate the law may face lower penalties than those who violate the law *nonwillfully*. For example, an individual who holds $1 million in a foreign account during the course of a year but withdraws it before the filing deadline and then willfully fails to file an FBAR faces a maximum penalty of $100,000. But a person who errs nonwillfully in listing 20 accounts with an aggregate balance of $50,000 can face a penalty of up to $200,000. *Id.,* at 14. Reading the law to apply nonwillful penalties per report invites none of these curiosities; the government's per-account theory invites them all.[8]

The government does not dispute any of this but replies that the per-report interpretation risks an anomaly of its own. After all, the government observes, the BSA affords the Secretary considerable discretion in formulating reporting requirements. So much so, the government contends, that the Secretary could require a separate report for each account and in that way effectively achieve a per-account

———————

[8] The dissent suggests that these examples bear "limited relevance" because it is only "natura[l]" that a person "who violates the law many times" might incur more penalties. *Post*, at 9–11. But this assumes that violations accrue on a per-account basis, which begs the very question at issue before us.

penalty for nonwillful violations. Brief for United States
32. But what does this prove? Assuming the Secretary
could require more frequent reports (a question not before
us), that would mean the Secretary could also require less
frequent reports (for example, every other year). Likewise,
the Secretary could reduce the amount of information re-
quired in those reports (say, expanding the tick-box option
to all filers, not just those with 25 or more accounts). Per-
haps more fundamentally, whether the Secretary may law-
fully ordain more or fewer reports does nothing to answer
the question whether the Secretary may impose nonwillful
penalties on a per-report or per-account basis. That ques-
tion would still remain. Reply Brief 7–8.

C

To the extent doubt persists at this point about the best
reading of the BSA, a venerable principle supplies a way to
resolve it. Under the rule of lenity, this Court has long held,
statutes imposing penalties are to be "construed strictly"
against the government and in favor of individuals. *Com-
missioner* v. *Acker*, 361 U. S. 87, 91 (1959). Following that
rule here requires us to favor a per-report approach that
would restrain BSA penalties over a per-account theory
that would greatly enhance them.

The government resists this conclusion by seeking to dis-
tinguish *Acker*. That case involved a penalty provision in
the Internal Revenue Code, the government emphasizes,
while this case involves a penalty provision in the BSA.
Brief for United States 44–45. But that distinction makes
no difference. The rule of lenity is not shackled to the In-
ternal Revenue Code or any other chapter of federal statu-
tory law. Instead, as *Acker* acknowledged, "[t]he law is set-
tled that *penal statutes* are to be construed strictly," and an
individual "is not to be subjected to a penalty unless the
words of the statute plainly impose it." 361 U. S., at 91 (in-

ternal quotation marks omitted and emphasis added). Notably, too, *Acker* cited to and relied on cases applying this same principle to penalty provisions under a wide array of statutes, including the Communications Act of 1934, a bankruptcy law, and the National Banking Act. See *ibid.* (citing *FCC* v. *American Broadcasting Co.*, 347 U. S. 284, 296 (1954); *Keppel* v. *Tiffin Savings Bank*, 197 U. S. 356, 362 (1905); and *Tiffany* v. *National Bank of Mo.*, 18 Wall. 409, 410 (1874)); see also Scalia & Garner at 297 (the rule of lenity applies "to civil penalties").

Two additional features of this case make it a particularly appropriate candidate for the rule of lenity. First, the rule exists in part to protect the Due Process Clause's promise that "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle* v. *United States*, 283 U. S. 25, 27 (1931); see also *Connally* v. *General Constr. Co.*, 269 U. S. 385, 393 (1926); *Wooden* v. *United States*, 595 U. S. ___, ___–___ (2022) (GORSUCH, J., concurring in judgment) (slip op., at 6–9). And the government's current theory poses a serious fair-notice problem. The relevant provisions of the BSA nowhere discuss per-account penalties for nonwillful violations. A number of the government's own public guidance documents have seemingly warned of per-report, not per-account, penalties for non-willful violations. See Part II–B, *supra*; Brief for Tax Counsel 6–24. We are even told that, until 2008 and 2009, when the government began aggressively enforcing FBAR penalties, "many experienced tax professionals and return preparers were not aware of the FBAR reporting obligations," let alone aware of the government's current theory about the scope of penalties for non-willful violations. Brief for Center for Taxpayer Rights as *Amicus Curiae* 24, 20–28, and n. 21. If many experienced accountants were unable to anticipate the government's current theory, we do not see how "the common world" had fair notice of it. *McBoyle*, 283

U. S., at 27.

Second, the question before us has criminal as well as civil ramifications. Section 5321 outlines *civil* penalties for nonwillful and willful "violation[s]" of the BSA. Next door, §5322 provides *criminal* sanctions for "willfully violating" the Act. The term "violation" or "violating" is a constant between these two provisions. Accordingly, if the government were right that violations accrue on a per-account rather than a per-report basis under §5321, the same rule would apply under §5322. Each willfully misstated or late-reported account, rather than each deficient or late-filed report, would give rise to a separate criminal violation carrying the possibility of a $250,000 fine and five years in prison. In a case like Mr. Bittner's, involving 5 reports and 272 accounts, that would mean a person who willfully violates the BSA could face a $68 million fine and 1,360 years in prison rather than a $1.25 million fine and 25 years in prison. In these circumstances, the rule of lenity, not to mention a dose of common sense, favors a strict construction. See *Leocal* v. *Ashcroft*, 543 U. S. 1, 12, n. 8 (2004) (lenity applies when a disputed statutory provision has "both criminal and noncriminal applications"); see also *FCC*, 347 U. S., at 296; *United States* v. *Thompson/Center Arms Co.*, 504 U. S. 505, 517–518 (1992) (plurality opinion).

### III

Best read, the BSA treats the failure to file a legally compliant report as one violation carrying a maximum penalty of $10,000, not a cascade of such penalties calculated on a per-account basis. Because the Fifth Circuit thought otherwise, we reverse its judgment and remand the case for further proceedings consistent with this opinion.

*So ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 21–1195

———————

## ALEXANDRU BITTNER, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[February 28, 2023]

JUSTICE BARRETT, with whom JUSTICE THOMAS, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

Alexandru Bittner, an American citizen, held as much as $16 million across more than 50 bank accounts in Romania, Switzerland, and Liechtenstein.\*  He acknowledges that the Bank Secrecy Act (BSA) and its implementing regulations required him to report his interest in these accounts to the Federal Government annually.  Bittner also admits that he failed to comply with that requirement for five consecutive years.  Because he failed to report 272 accounts, the Government concluded that he violated the law 272 times and assessed a penalty for each violation.  Bittner, on the other hand, argued that he violated the law just five times—once for each annual form that he failed to file.

The Court agrees with Bittner and holds that the failure to file a legally compliant form is a single violation, no matter how many accounts a citizen fails to report.  I respectfully disagree.  The most natural reading of the statute establishes that each failure to report a qualifying foreign account constitutes a separate reporting violation, so the Government can levy penalties on a per-account basis.

———————

\*In 2007, for example, he held over $10 million across 61 foreign bank accounts.  The pattern continued: $10 million across 51 accounts in 2008, $3 million across 53 accounts in 2009, $16 million across 53 accounts in 2010, and $15 million across 54 accounts in 2011.

I

This case requires us to decide whether a violation of the BSA's reporting requirement is the failure to file an annual form, or whether there is a separate violation for each individual account that is not properly reported. The answer lies in the text of the relevant statutes, 31 U. S. C. §§5314 and 5321. The Government assessed penalties against Bittner under §5321(a)(5)(A), which provides that "[t]he Secretary of the Treasury may impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314." Section 5314, in turn, directs the Secretary to "require a . . . citizen of the United States . . . to keep records, file reports, or keep records and file reports, when the . . . person makes a transaction or maintains a relation for any person with a foreign financial agency." §5314(a). The required "records and reports shall contain" certain information "in the way and to the extent the Secretary prescribes," such as the identity, address, and legal capacity of the participants in a transaction or relationship. *Ibid.*

The text of §5314 indicates that its reporting requirement attaches to each individual account. Most notably, it provides that the Secretary "shall require" a citizen to "file reports" when he "maintains a relation . . . with a foreign financial agency." *Ibid.* The subject matter of the required reports, then, is "a relation" with a foreign financial agency—or, more colloquially, an account with a foreign bank. *Ibid.* In other words, each relation with a foreign bank triggers the requirement to file reports. And because each relation is a matter of distinct concern under the statute, each failure to report an account violates the reporting requirement.

The enumerated list of information that the reports "shall contain" underscores the point. *Ibid.* That list includes information like "the identity and address of participants in

a . . . relationship," "the legal capacity in which a participant" in a relationship "is acting," and "the identity of real parties in interest." §§5314(a)(1)–(3). Each listed item is account specific because its contents can vary for each foreign account held. And each failure to report an account thus deprives the Government of the account-specific information that the statute requires.

That is not all. Section 5314 authorizes the Secretary to impose a recordkeeping requirement in addition to a reporting requirement. Recordkeeping violations cannot occur on a per-form basis because keeping records does not entail filing a form. Instead, they occur on a per-account basis because records naturally relate to specific accounts. And if violations of §5314's recordkeeping obligation accrue on a per-account basis, the same should be true of violations of §5314's obligation to file reports. The duties are parallel: Each kicks in "when" a citizen "maintains a relation" with a foreign financial agency, and each requires a person to collect the same account-specific information. §5314(a). Parallel duties should be susceptible to parallel violations.

The civil penalty provisions in §5321 confirm this reading of the substantive obligations imposed by §5314. Recall that §5321 allows the Secretary to "impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314." §5321(a)(5)(A). The statute then proceeds to set the maximum penalty for nonwillful violations, provide a reasonable cause exception for those same violations, and set the maximum penalty for willful violations. §§5321(a)(5)(B)–(D). Throughout, Congress used the term "violation" in an account-specific way.

Consider the reasonable cause exception. It provides that "[n]o penalty shall be imposed . . . with respect to any" nonwillful "violation" of §5314 if (1) "such violation was due to reasonable cause" and (2) "the balance in *the account* at the time of the transaction was properly reported."

§5321(a)(5)(B)(ii) (emphasis added).  By conditioning eligi-
bility for the *excuse* on taking steps to report accurate infor-
mation about a particular account, this language suggests
that the underlying *violation* of §5314 is similarly tied to a
specific account.  After all, "if the exception for non-willful
violations applies on a per-account basis, then logically the
violations the exception forgives must arise on a per-
account basis too."  19 F. 4th 734, 747–748 (CA5 2021).

The willful penalty provisions sing the same tune.  The
maximum penalty for a willful violation is the greater of
$100,000 or, "in the case of a violation involving a failure to
report the existence of an account or any identifying infor-
mation required to be provided with respect to an account,"
50 percent of "the balance in the account at the time of the
violation."  §§5321(a)(5)(C)(i), (D)(ii).  "This language makes
clear that a violation may involve 'a failure to report the
existence of'" a particular account.  *United States* v. *Boyd*,
991 F. 3d 1077, 1089 (CA9 2021) (Ikuta, J., dissenting).  By
making the maximum penalty for a willful violation in some
cases a function of "the balance in the account at the time
of the violation," the provision contemplates that discrete
violations      correspond      to      discrete      accounts.
§5321(a)(5)(D)(ii).

This pattern matters.  The "normal rule of statutory in-
terpretation" is that "identical words used in different parts
of the same statute are generally presumed to have the
same meaning."  *IBP, Inc.* v. *Alvarez*, 546 U. S. 21, 34
(2005).  If a "violation" of §5314 has account-specific conno-
tations in the reasonable cause and willful penalty provi-
sions, it follows that a "violation" of §5314 has account-
specific connotations when it comes to nonwillful penalties
too.

The Secretary's implementing regulations follow the
BSA's lead.  They require regulated persons to report the
existence of each foreign financial account to the Govern-
ment each year.  Start with 31 CFR §1010.350 (2011).  It

says that "[e]ach United States person having a financial interest in . . . a bank, securities, or other financial account in a foreign country shall *report such relationship* to the Commissioner of Internal Revenue for each year in which such relationship exists and shall provide such information as shall be specified in a reporting form prescribed under 31 U. S. C. 5314 to be filed by such persons." §1010.350(a) (emphasis added). The reporting form is known as an FBAR—a Report of Foreign Bank and Financial Accounts. *Ibid.* A separate regulation establishes the deadline for reporting these relationships. "Reports required to be filed by §1010.350 shall be filed" by "June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." §1010.306(c), as amended, 81 Fed. Reg. 76864 (2016). Put together, these provisions impose a substantive obligation to report interests in foreign bank accounts each year in which those interests exist. See §1010.420 (referring to "accounts required by §1010.350 to be reported to the" Government).

Notably, the regulations distinguish between the form used to report accounts and the reports themselves. See §1010.306(d) (the "*[r]eports* required by" §1010.350 "shall be filed on *forms* prescribed by the Secretary" (emphasis added)); §1010.306(e) (the "*[f]orms* to be used in making the *reports* required by" §1010.350 "may be obtained from" the Government (emphasis added)). This underscores that FBAR forms are not themselves the "reports" required by the statute; rather, they are the procedural mechanism used to implement the duty to report each foreign account. This distinction tracks §5314, which emphasizes a citizen's duty to file "reports" but nowhere mentions FBARs—or, for that matter, forms of any sort. §5314(a). So far as §5314 is concerned, the Secretary could have chosen a different mechanism to implement the statute. For instance, rather than instructing citizens to report all accounts on a single

form, he could have instructed citizens to report each account on a separate form. And if the Secretary had taken that route, Bittner would be hard pressed to deny that he would have violated the statute 272 times by failing to file 272 forms. That difficulty illustrates Bittner's fundamental misunderstanding of the account-specific obligation imposed by §5314, which is indifferent to the mechanism by which the obligation is discharged.

In the end, "the applicable statute and regulations make clear that any failure to report a foreign account is an independent violation, subject to independent penalties." *Boyd*, 991 F. 3d, at 1089 (Ikuta, J., dissenting). A person who fails to report multiple foreign accounts on a single annual form violates the BSA and its implementing regulations multiple times, not just once. So the Government was within its rights to assess a separate penalty against Bittner for each qualifying foreign account that he failed to report properly.

## II
### A

The Court reads the relevant provisions differently. It reasons that the legal duty imposed by §5314 is "the duty to file reports." *Ante*, at 5. In the Court's view, that "statutory obligation is binary": "Either one files a report 'in the way and to the extent the Secretary prescribes,' or one does not." *Ante*, at 5–6. So penalties for nonwillful violations must "accrue on a per-report, not a per-account, basis." *Ante*, at 6. And because Bittner failed to file timely FBARs for five years, the Court concludes that he violated the law only five times.

The Court's core error is to conflate the *reports* referred to in §5314 with the annual FBAR *form*. To reiterate, the two are distinct. And because the FBAR is not itself the statutorily required "report," the Court's conclusion—that Bittner violated §5314 just five times because he untimely filed five FBAR forms—does not follow. The BSA and its

implementing regulations required Bittner to file one report per year of each qualifying foreign financial account that he maintained. Each failure to report an account is a discrete violation regardless of whether the violations were clustered on a single form.

The Court does not just misread §5314; it misreads §5321 too. It points out that account-specific language is present in the reasonable cause and willful penalty provisions but absent in the provisions setting the nonwillful penalty. Because "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another," *Department of Homeland Security* v. *MacLean*, 574 U. S. 383, 391 (2015), the Court takes the contrast as evidence that nonwillful penalties cannot apply on a per-account basis. *Ante*, at 6–8 (invoking the *expressio unius* canon).

Not so. The *expressio unius* canon is a general rule, inapplicable where context suggests otherwise—as it does here. Congress capped the penalty for a nonwillful violation at a flat $10,000. §5321(a)(5)(B)(i). Because the penalty amount does not depend on the balance in an account, Congress had no reason to use account-specific language. By contrast, the maximum penalty for a willful violation is the greater of $100,000 or 50 percent of the account balance at the time of the violation, and the reasonable cause exception lifts a penalty only if the account balance was properly reported. §§5321(a)(5)(B)(ii), (C)(i), (D)(ii). Because the application of both provisions depends on the account *balance*, Congress needed to use account-specific language. The reason why Congress included account-specific language in only two of these three provisions is therefore readily apparent. Regardless, the variation in language does not do much for the Court. These provisions in §5321 explain the varying *penalties* that the Secretary may assess for a violation of §5314 but do not alter the nature of the underlying conduct that constitutes a *violation*. *Boyd*, 991 F. 3d, at

1089 (Ikuta, J., dissenting). That conduct, as discussed, is account specific.

B

The Court also invokes a handful of "contextual clues" to support its conclusion. *Ante*, at 9. None of these "clues" justifies a departure from the best reading of the text.

Begin with the Government's guidance to the public about what the BSA requires. The Court identifies a handful of statements, primarily from Internal Revenue Service (IRS) fact sheets and form instructions, indicating that a failure to file an annual FBAR may result in a penalty of up to $10,000. The Court acknowledges that these materials do not control the analysis, yet it still goes on to suggest that they cut against the Government's interpretation. *Ante*, at 9–10.

I am surprised that the Court is moved by this administrative guidance. For one thing, even Bittner concedes that the materials do not speak directly to the question presented in this case: whether additional penalties may accrue when a person fails to report *multiple* accounts on a single form. Reply Brief 18; Tr. of Oral Arg. 39–40. For another, the Court neglects to mention administrative materials that endorse the Government's per-account interpretation. See, *e.g.*, Brief for American College of Tax Counsel as *Amicus Curiae* 18, 21 (identifying IRS staff guidance materials from 2008 and 2015 explaining that FBAR penalties may be assessed per account). But in any event, guidance materials add little, if anything, to the interpretive enterprise when the traditional tools of construction supply an answer.

The Court also highlights the Secretary's regulatory decision to allow the rare covered person with 25 or more foreign financial accounts to "only provide the number of financial accounts and certain other basic information on the

report." §1010.350(g)(1). According to the Court, this special rule is a knock against the Government's reading because it does not require detailed account-level information in such a filer's initial report. *Ante*, at 12.

But the Secretary's accommodation does not advance the Court's cause. A person with 25 or more accounts still "will be required to provide detailed information concerning each account when so requested by the Secretary or his delegate." §1010.350(g)(1). And the Secretary's recordkeeping regulation requires covered persons to retain the same detailed information about each account that otherwise would be reported on the annual form. See §1010.420. So a person with 25 or more accounts violates the BSA for each account with a reporting or recordkeeping problem just the same as a person with fewer than 25 accounts. In both cases, the violation is the failure to report the account properly or to keep records of it.

That consequence is consistent with the statute's purpose. In arguing otherwise, the Court leans on what the preamble does *not* say: "[T]hat Congress sought to maximize penalties for every nonwillful mistake." *Ante*, at 11. Notably, though, the Court skims over what the preamble *does* say: that the BSA is designed to "require certain reports or records" that assist the Government in "criminal, tax, or regulatory investigations" and in "intelligence or counterintelligence activities, including analysis, to protect against terrorism." 31 U. S. C. §5311. When analyzing complex webs of money laundering or funding for international terrorism, knowing about every account matters—and lacking information about 15 accounts is certainly more harmful to law enforcement than lacking information about 1 account. See Brief for United States 38. Given the stated purpose, authorizing a penalty for each undisclosed account makes sense.

Finally, the Court insists that a per-account reading

leads to absurd results. Its concerns range from the over-
stated to the incorrect, and they are in any event of limited
relevance to the statutory interpretation question before us.

First, the Court posits a comparison between a person
who nonwillfully violates the law once by failing to report a
single account with a balance of $10 million and a person
who nonwillfully violates the law 12 times by failing to re-
port 12 accounts with an aggregate balance of $10,001. Be-
cause the first is subject to a maximum penalty of $10,000
and the second is subject to a maximum penalty of
$120,000, the Court concludes that there is an "incongruity"
in the statutory scheme. *Ante*, at 13. But a person who
violates the law many times might naturally pay a steeper
price than a person who violates the law just once, regard-
less of the balances in their unreported accounts. Indeed,
the Court seems untroubled by the incongruity that flows
from its own reading: The Secretary is constrained by the
same maximum penalty ($10,000) for a person who nonwill-
fully fails to report 100 accounts on an annual FBAR as he
is for a person who nonwillfully fails to report just 1 ac-
count. The per-form reading makes it difficult for the Gov-
ernment to assess stiffer penalties for more serious noncom-
pliance.

Consider next the Court's claim that, on the Govern-
ment's reading, those who willfully violate the law may face
lower penalties than those who nonwillfully violate the law.
*Ibid.* The Court provides the example of a person who holds
$1 million in a foreign account during the course of a year
but withdraws those funds before the filing deadline and
willfully fails to report the account. Under §5321(a)(5)(C),
that person faces a maximum penalty of $100,000, while a
person who nonwillfully fails to report 20 accounts with an
aggregate account balance of $50,000 might face a penalty
of up to $200,000 under §5321(a)(5)(B)(i). This is not an
apples-to-apples comparison: The first person willfully vio-
lated the law once, while the second nonwillfully violated

the law 20 times. That the latter might face a higher penalty than the former is therefore beside the point. An actual apples-to-apples comparison shows that willful violators do face a much heavier fine: The maximum penalty for a single willful violation will always be at least 10 times greater than the maximum penalty for a single nonwillful violation. See §§5321(a)(5)(B)(i), (C)(i).

## III

There is no denying that the Government opted to pursue a substantial penalty in this case: $10,000 for each of Bittner's 272 alleged violations, for a total penalty of $2.72 million. Yet while the statutory scheme allows for substantial penalties, it also offers a safe haven. No penalty shall be imposed for a nonwillful violation of §5314 if (1) "such violation was due to reasonable cause" and (2) "the balance in the account at the time of the transaction was properly reported." §5321(a)(5)(B)(ii).

Bittner raised this defense below, and the Government conceded that he satisfied its second prong by properly reporting the balances in his accounts on his late-filed FBARs. 19 F. 4th, at 740, and n. 2. But the District Court and Court of Appeals both roundly rejected Bittner's argument that he had reasonable cause for failing to timely report his accounts. After evaluating the pertinent facts and circumstances, both courts concluded that Bittner "did not exercise ordinary business care and prudence in failing to fulfill his reporting obligations." *Id.*, at 742; see also 469 F. Supp. 3d 709, 729 (ED Tex. 2020). On the contrary, Bittner "put no effort into ascertaining" those obligations despite operating as a sophisticated business professional who held "interests in dozens of companies, negotiated purchases of Romanian government assets, transferred his assets into holding companies, and concealed his earnings in 'numbered accounts.'" 19 F. 4th, at 742. Bittner abandoned his reasonable cause argument when he came to this Court,

so we have no occasion to consider its merit. Brief for Petitioner 11, n. 9. But the defense is available to litigants who can satisfy it.

\* \* \*

The most natural reading of the BSA and its implementing regulations establishes that a person who fails to report multiple accounts on the prescribed reporting form violates the law multiple times, not just once. Because the Court declines to adopt that reading, I respectfully dissent.